**STATE ex rel. CITY OF SHREVEPORT et al. v. DICKSON.***

**No. 4749.**

Court of Appeal of Louisiana. Second Circuit.

Nov. 3, 1933.

---

*Rehearing denied December 1, 1933.

See, also, 150 So. 581.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellant.

Aubrey M. Pyburn and Lee, Gilmer & Lee, all of Shreveport, for appellees.

TALIAFERRO, Judge.

In this case, the city of Shreveport and John McW. Ford, superintendent of the department of accounts and finances thereof, seek, by mandamus, to compel respondent, C. Bickham Dickson, superintendent of the department of public utilities, to deliver to said superintendent of accounts and finances all the books of account, records, and equipment in said department of public utilities relating to the collection, administration, and disbursing of city funds, a detailed list thereof being attached to relators' petition; and to deliver to him all funds belonging to the city of Shreveport in his possession, custody, or under his control.

The governing authority of the city of Shreveport, prior to September 16, 1910, was a mayor and fifteen trustees, under the provisions of its legislative charter (Act No. 158 of 1898). On said date the city availed itself of the permit allowed by Act No. 302 of 1910, by adopting the commission form of government, which superseded the special charter under which it had theretofore operated, and thereafter its governmental, legislative, and administrative affairs were vested in and performed by a mayor and four commissioners, the mayor being superintendent of the department of public affairs and education, one councilman, as superintendent of the department of accounts and finances, another councilman, as superintendent of the department of public safety, another councilman, as superintendent of the department of public utilities, and another councilman, as superintendent of the department of streets and parks.

It is provided in section 4 of Act No. 302 of 1910 that: "The council shall determine the powers and duties to be permitted by and assign them to the appropriate department."

And, in keeping therewith, the new administrators for the city, on November 14, 1910, allocated to each department the duties pertaining thereto. Those referred to the department of accounts and finances being: Accounts, finances, secretary and treasurer, and tax collector, auditor, Red river bridge, fiscal agent, and official printing.

And those referred to the superintendent of the department of public utilities being: Cemeteries, building inspector, plumbing in-

spector, traction companies, lights, waterworks and sewerage, gas inspectors, signs and electrical inspection.

In the year 1917, the city of Shreveport acquired a complete waterworks system, which system, as alleged by relators, was by common consent and acquiescence of the members of the council, but without special action by them, taken in charge by the department of public utilities, being known thereafter and classified under the department of public utilities as the department of water and sewerage. The details of operation of the subdepartment of water and sewerage under the superintendent of the department of public utilities are fully disclosed by the allegations of article IV of relators' petition, which are supported by admissions and evidence in the case, and which we quote:

"That said Department of Water & Sewerage, as a part of the Department of Public Utilities, has for a number of years prior to the adoption of Ordinance No. 39 of 1932, hereinafter referred to, but without authority from or any action by the said City Council, functioned to all intents and purposes as a separate and distinct unity of the city government, its affairs being conducted entirely at variance with the conduct of other departments of the City, in that it kept its own accounts, received its own revenues from sales of water and from other sources, deposited all funds collected by it in the fiscal agency bank of the City in a separate account from that in which other funds of the City were deposited, and administered and disbursed said revenues under a separate budget, all disbursements being made by checks signed by the Secretary-Treasurer and Mayor of the City and countersigned by the Commissioner of Public Utilities and Superintendent of the Department of Water & Sewerage; and relators aver that insofar as said accounts were kept in said department and funds due the city from the sales of water and other sources were administered and disbursed by and in said department, said practice and procedure was in violation of the provisions of Act 302 of 1910, as amended, in that it deprived the Department of Accounts and Finance and its Superintendent of the keeping of accounts and records of the City of Shreveport and of the collection and administration and disbursement of the funds of the City of Shreveport to the extent of books, records and accounts kept and of the funds received, collected and disbursed by the said Water & Sewerage Department and that said functions logically and properly inhere in and were vested in the Department of Finance and Accounts under the provisions of Act No. 302 of 1910 as amended."

A sufficient number of the electorate of the city, availing themselves of the terms of section 4 of Act No. 302 of 1910, by petition to the city council, initiated the move to adopt Ordinance No. 39 of the city, referred to by relators. The council declined to pass the ordinance, whereupon, after due delays and proceedings, it was, by plebiscite of the electors adopted decisively as a law for their government. There is now no issue in this suit as to the legality of the adoption of said ordinance. We quote from it those portions bearing upon the issues in the present controversy:

"To formally define, determine and assign the powers and duties to be performed by each of the five named Departments of the City Government under the provisions of law."

"Section 3: The following officers shall be elected by the City Council on the nomination of the Superintendent of the Department of Accounts and Finance:

"A Secretary-Treasurer and Ex-Officio Tax Collector;

"An Auditor;

"The above named officers shall be under the supervision and control of the Superintendent of the Department of Accounts and Finance.

"The Superintendent of the Department of Accounts and Finance shall make rules and adopt policies for the proper conduct of this department. All of the books of accounts and all of the records of the City shall be kept in this Department, and this Department shall collect all funds due the City, depositing the same in the depository bank or banks selected by the City Council, and disbursing the same according to law. * * *

"Section 5: The Superintendent of the Department of Public Utilities shall be Superintendent of all Public Utilities, and shall have supervision over the following sub-departments: Cemeteries, Plumbing, Electrical, Street Lighting, Water & Sewerage and the City water supply. He shall formulate general rules and policies for the proper conduct of these subordinate departments and communicate the same to the heads of all subordinate departments.

"The following officers shall be elected by the City Council on the nomination of the Superintendent of the Department of Public Utilities:

"The Superintendent of the Water & Sewerage Department;

"The Plumbing Inspector;

"The Electrical Inspector;

"The above named officers shall be under the supervision and control of the Superintendent of the Department of Public Utilities.

"The Superintendent of the Water & Sewerage Department shall have the management and control of the operation of the waterworks plant and all equipment."

Following adoption of Ordinance No. 39, Commissioner Ford, relator herein, made request of Commissioner Dickson for delivery

to him of the books, records, etc., appertaining to the subdepartment of water and sewerage, which was refused, and thereafter, resolution No. 41 of the city council was adopted, wherein demand was made on Commissioner Dickson that he deliver to relator Ford the records, books, funds, and equipment of the water and sewerage department. This demand was also refused. This suit, authorized by said Ordinance No. 41, was then instituted.

It is averred and contended by relators that: "* * * The Department of accounts and Finance is vested with exclusive custody of the keeping and control of all books of account and records of the City of Shreveport, the collection of all funds belonging to and due to the City of Shreveport, the depositing of the same and the disbursement thereof including the books of account and records kept and funds collected or revenues received from the sales of water and sewerage rentals and for services rendered and performed in and by the Water & Sewerage Department of said City."

Respondent challenges the right of relators to have the controverted questions involved in this suit determined by a mandamus proceeding. He takes the position that under the statutes of this state, with regard to government under the commission plan, the superintendence of the water department could be assigned only to his department, and that such has heretofore been accomplished by resolutions and ordinances of the city of Shreveport, among which is included that of November 14, 1910; and that even under the provisions of Ordinance No. 39 of 1932, he is constituted the superintendent of the department of public utilities, including the department of water and sewerage. The further averment is made by respondent:

"* * * And respondent shows further that by Ordinance 20 of 1930, the municipal council of the City of Shreveport authorized the issuance of $500,000.00 of Waterworks Extension and Improvement Bonds of the City of Shreveport secured by mortgage and pledge of all revenues arising in the Department of Water & Sewerage, which bonds are outstanding and unpaid, the provisions of the contract entered into in accordance with said resolution being in full force and effect; that the contract referred to, a copy of which is made part hereof, provides for certain monthly payments to interest and sinking fund and requires that all ordinary expenses of the water plant and also repairs and replacements thereto shall be paid in addition to the interest and sinking fund created and permits the release into the general fund of the City of Shreveport of only the excess of revenues from receipts of the Water Department after the payments expressly provided for; that the resolution and contract described constitutes an irrevocable pledge and dedication of the receipts of the Water Department, which

cannot be impaired by any ordinance of the City of Shreveport however adopted and that the trust funds created cannot be diverted nor can any portion of the receipts of the Water Department other than the excess of revenues described be placed in the general fund under the supervision or control of the Commissioner of Accounts and Finance."

And that said "Ordinance No. 39 is invalid and illegal for the reason that the subject matter thereof being administrative, was not a proper subject for the referendum as provided for by section 14 of Act No. 302 of 1910."

In the alternative, respondent pleads: "That even under the provisions of Ordinance 39 of 1932 the Commissioner of Accounts and Finance is given no powers beyond the ordinary functions of that office in handling the general fund of the City appropriated and dedicated to governmental purposes; that all revenues of the Water Department which is owned by the City of Shreveport in its proprietary capacity are constituted funds for the payment of the obligations of that Department and that only the excess of revenues therefrom become a part of the general fund and only such excess of revenues can be delivered to the Commissioner of Accounts and Finance for his administration in the payment of governmental expense."

There was judgment in the lower court in favor of relators to the full extent of their demands. Respondent has appealed.

In this court respondent says the substantial questions to be determined are:

1. Can the writ of mandamus issue under the circumstances presented?

2. Is the administration of the affairs of a water department acquired under the provisions of Act No. 248 of 1912 or the delegation of authority with regard thereto subject to the referendum provided for in Act No. 302 of 1910?

3. Can the collections of water rents or revenues be appropriately assigned under the provisions of Act No. 302 of 1910 to the department of public utilities?

4. Has that duty been heretofore assigned to such department by acquiescence or otherwise?

5. Has there been any attempt by valid ordinance to alter the functions heretofore performed by the commissioner of public utilities or to assign the duty of collection of water revenues to the commissioner of finance?

So far as the general superintendence of the subdepartment of water and sewerage is concerned, there is no dispute. This is vested in the superintendent of the department of public utilities, and embraces many duties and requires much detail of service in order to provide the city and its inhabitants with an adequate supply of wholesome

water. This superintendence was allocated by the ordinance of November, 1910, and was not, nor was it intended to be, materially affected by plebiscite Ordinance No. 39; but it must be conceded that the clear intent and expressed purpose of this ordinance was to work material changes in the administration of the affairs of many of the subdepartments of the city, especially in that of the water and sewerage department. The modus operandi of the financial and clerical phases of of this subdepartment since 1917, when considered in the light of unambiguous provisions of the plebiscite ordinance, relating to the definition of the powers of the superintendent of the department of accounts and finance, makes this quite apparent. Prior to the adoption of this ordinance by referendum, the books, records, equipment, etc., needful to the establishment and continuity of operations of the department of water and sewerage were located in the department of public utilities, and the water rentals, and proceeds of sale of water, etc., were collected, handled, deposited, and disbursed by that department. Now, the ordinance plainly states that the "books of accounts, and all the records of the City shall be kept in this Department (that of Accounts and Finances), and this Department shall collect all funds due the City, depositing the same in the depository bank or banks selected by the City Council, and disbursing the same according to law." Language could scarcely be made to express the intent more clearly. Respondent does not specially complain about the terms of the ordinance which require the department of accounts and finance to keep all the records and books of the city, but does strenuously take issue with relators' contention that the term "all funds due the city," embraces the revenues of the subdepartment of water and sewerage. So far as assigning to the department of accounts and finance the duty to keep all permanent records and books appertaining to the city's business, financial and otherwise, it seems obvious to us that this action was eminently proper. This is the "appropriate department" to perform such duties. The propriety of investing the department of accounts and finance with the duty and power to collect "all funds due the city," including water rentals, etc., heretofore exercised by the department of public utilities, may be defended on almost as certain grounds as could be urged in support of the right to invest that department with the duty of keeping all records, books, etc., of the city. As a matter of economy, it would certainly eliminate duplicity of work, obviate the keeping of more than one set of records, and reduce expenses of the department materially. From this standpoint it could be justified. No reason is advanced to indicate that the department of accounts and finance is not as competent and as able to collect the funds due the city

from sales or rentals of water as the department of public utilities is, and as the records pertaining to such collections are to be kept by the department of accounts and finance, it certainly follows as a corollary that the funds should first find their way into the city's possession through this department. In this connection, the record shows that the permanent records and accounts of all departments and subdepartments of the city, excepting that of water and sewerage, are kept by and in the department of accounts and finance, and that that department deposits all moneys and funds collected for the city's account and disburses same.

We do not see any force in the argument that if relators' demands are granted that it will work an impairment of the city's obligations entered into in connection with the issuance by it of bonds in 1930 to improve and extend its waterworks system. The covenants of that contract, with respect to segregation of funds dedicated to retire the city's bonds, may be lived up to by the city as effectively when operating through the agency of the department of accounts and finance as could be done through respondent's department. Funds acquired from sales of water belong to the city, subject to disposition and disbursement pursuant to and in keeping with its contractual relations with the holders of its bonds, as long as there are bonds outstanding. Any excess of revenues derived from sales of water, after the requirements of the bond mortgage have been met, is covered into the general fund of the city, and, of course, when all the bonds have been retired, all revenues or funds derived from sales of water will be subject to such allocation and disposition as the council sees fit. The bond mortgage makes no mention of any department of the city as being obligated to carry out its terms. The city alone is mentioned as the mortgagor, and properly so; and the undertakings of that instrument devolve upon it in its corporate capacity. The means, instruments, and agencies by and through which the fulfillment of those obligations is to be accomplished are merely matters of detail to be worked out by the city in the orderly handling of its affairs. The bondholders are not specially interested in the means to the end. They are interested in results only, and will have a standing to complain when the means are so manipulated that their rights are unfavorably affected or prejudiced thereby.

Webster's New International Dictionary (Merriam Series), page 877, column 1, defines "fund" as follows:

"A sum of money, especially one the principal and interest of which is appropriated or devoted to a specific object, as the carrying on of some commercial undertaking; stock or capital; as, the fund of a bank or ecclesiastical society; a pension fund; a

fund for the maintenance of lectures or poor students; pl., money and negotiable paper immediately or readily convertible into cash; available pecuniary resources; as a bank's funds; to be out of funds.

"Money systematically collected to meet the expenses of some specific object; a portion of revenues pledged for a particular debt or debts."

In common parlance, mention of the word inclines the mind to focus on money, though the word, technically, may be employed to cover other articles of value.

"The term 'funds,' as employed in commercial transactions, according to its usual acceptation and signification, means money." 4 Words and Phrases, First Series, page 3005.

"A fund is a deposit of resources, or money appropriated as the foundation of some commercial operation, or a store laid up to draw from." 4 Words and Phrases, First Series, page 3004.

Definitions of this character could be indefinitely cited, but these serve to convey the idea or purpose intended by the voters in the adoption of Ordinance No. 39. All funds means all moneys, especially those dedicated particularly to the discharge of certain obligations. "All funds," like the phrase, "any proposed ordinance," in section 14 of Act No. 302 of 1910, means what it says, and should not be affected by exceptions of the courts' own origin.

Respondent challenges the right to determine by referendum and plebiscite how the administration of the affairs of a water department, acquired under the provisions of Act No. 248 of 1912, shall be conducted, or by whom. He takes the position that the referendum provision of Act No. 302 of 1910 relates only to governmental matters, and cannot be extended to functions exercised under a different statute, where the city acts in a proprietary capacity. Act No. 248 of 1912, authorizes cities and towns to purchase and operate systems of waterworks and sewerage. Respondent relies upon the provisions of section 7 thereof, which we quote: "Cities and towns are hereby authorized to carry out the intents and purposes of this Act—through the city or town council, or through such board or commission as they may organize; or they may delegate the authority to any existing board or commission, either for all or any of the systems, herein mentioned—and the powers and duties of such boards or commissions shall be; prescribed by the councils. But this Act shall not repeal laws now conferring rights upon any existing board or commission, unless the cities or town should vest the powers of this Act in some other board or commission, or should act through its own city or town council."

We are unable to agree with argument of relator's learned counsel. This law simply authorizes cities and towns, availing themselves of its provisions, to create a board or commission to operate the system of water and sewerage owned or acquired by them, with such powers and authority as the governing authority thereof may delegate to such board or commission. It is argued that, since the city of Shreveport availed itself of this law in acquiring and operating its waterworks and sewerage system, and having by common consent and acquiescence permitted the department of public utilities to operate and administer same, the status thus acquired and fixed could not be affected by a referendum authorized by statute of prior date to the 1912 Act.

A complete answer to this argument is that the city of Shreveport has created no board or commission or office to operate its system of waterworks and sewerage. The city, through one of its co-ordinate departments, has operated the system since its acquisition, and the city now wishes to transfer a portion of such administration and operation to the appropriate department.

In Dickson v. Hardy, 177 La. 447, 148 So. 674, 677, the validity of plebiscite ordinance No. 39 was attacked by plaintiff. It was there contended that the referendum clause, section 14 of Act No. 302 of 1910, was limited in its scope to proposed ordinances legislative, and not administrative, in character. That contention was rejected by the court. It was held that the language "any proposed ordinance may be submitted" (to the electorate) meant what it said, was comprehensive in character, and was not subject to exceptions. We here quote what the court said on this subject:

"Nor are we impressed by the contention of able counsel for petitioner that the referendum clause, section 14 of Act No. 302 of 1910, is limited in its scope to proposed ordinances legislative, and not administrative, in character, since, under this section, 'any proposed ordinance may be submitted' to the electorate, regardless of its character. The language of this section is clear and free from all ambiguity and the letter of it is not to be disregarded under the pretext of pursuing its spirit. Rev. Civ. Code art. 13. Besides, in our opinion, Ordinance 39 of 1932 is legislative in character.

"It is clear that the city council of the city of Shreveport had the authority to pass Ordinance 39 of 1932, if the commissioners had seen fit so to do. This being the case, the electorate had the right to adopt the ordinance when submitted. Otherwise, the referendum clause of Act No. 302 of 1910, the charter of the city of Shreveport, would be a dead letter."

In the present case, respondent, who was plaintiff in the case quoted from, supra, takes the same position as he did in the former case. The Supreme Court has settled that question.

We have carefully studied the very thorough and comprehensive brief submitted by respondent's energetic counsel. No phase of the case is omitted from their exhaustive discussion of the points involved. We have, nevertheless, reached the conclusion, and hold that the electorate of the city of Shreveport legally possessed the power to adopt Ordinance No. 39, and that the exercise of that power for the objects and purposes embodied in the ordinance, was competent legislation on its part.

We will not enter upon an extended discussion of the right of relators to invoke mandamus writ to secure possession of the property and funds in controversy. No title to office is involved. It is simply a case of requiring an officer to give up records and property, the custody of which he no longer has the right to hold. We think resort to mandamus the proper course. High's Extraordinary Legal Remedies (3d Ed.) § 324, pp. 310, 320, 328; McQuillin on Municipal Corporations (2d Ed.) Vol. 6, § 2716, p. 623, on this subject, says: "In the event the title to the office is uncontested or has been settled by adjudication, mandamus will lie to compel the delivery of books and papers, belonging to the office. It is the proper remedy to compel a former public officer to transfer the books, papers, seal and paraphernalia of the office to his successor. The remedy in such case is without prejudice to the ultimate right to the office, as such right cannot be tried by such proceeding. The relator, in order to show a right to the books and papers of the office, must show that he has a prima facie right to the office and that the title to the office is not necessarily involved in the proceeding, and the court will investigate the matter to that extent to ascertain whether such is the case."

And the same author, in Vol. 2, § 661, page 515, says: "Mandamus is a proper remedy to compel an officer to perform a public duty. However, it is not the proper remedy to try the title of an office (the title of which is in dispute) either in a direct or collateral proceeding. But where the title to an office is uncontested or has been settled by adjudication, mandamus will lie to compel the delivery of books and papers belonging to the office. Where an officer has been duly elected or appointed to office and has qualified and demands of his predecessor the records pertaining to the office, and is refused, according to the weight of authority, mandamus is the only admissible writ."

In State ex rel. School Board v. Romero, 122 La. 885, 48 So. 312, the court held that mandamus would lie to compel a public officer, who has become functus officio, to turn over to his successor the books and papers pertaining to the office. Our own Code of Practice supports our conclusion. Articles 831 and 834, are as follows:

"This order may be issued at the discretion of the judge, even when a party has other means of relief, if the slowness of ordinary legal forms is likely to produce such a delay that the public good and the administration of justice will suffer from it.

"It may be directed to public officers to compel them to fulfill any of the duties attached to their office, or which may be legally required of them."

And in State v. Secretary of State, 32 La. Ann. 579, 585, the court said:

"It is urged that the objects sought to be accomplished in this proceeding are beyond the legitimate scope and intendment of the writ of mandamus, and we are referred to some very respectable common-law authorities in support of this position. We are of a different opinion.

"It has been frequently held that even under the common-law construction of a mandamus proceeding, that it is the proper remedy for the correction of such errors and the redress of such grievances as are complained of in this case. Clark v. McKenzie, 7 Bush (Ky.) 527; People v. Hilliard, 29 Ill. 414; Ellis v. County Com'rs of Bristol, 2 Gray [Mass.] 370; Burke v. Monroe County Sup'rs, 4 W. Va. 371.

"Besides, it has been expressly decided by this court that under the articles of the Code of Practice our courts have more extensive powers than those of the common law in issuing this writ. Hatch v. Bank of New Orleans, 1 Rob. 470. It will be seen by a reference to the articles of the Code of Practice that the remedy by Mandamus seems specially provided for just such a case as we have now before us."

The judgment of the lower court is affirmed.